STATE

v.

Vincent GAINES.

No. 86–165–C.A.

Supreme Court of Rhode Island.

June 25, 1987.

James E. O'Neil, Atty. Gen., Thomas Dickinson, Asst. Atty. Gen., Providence, for plaintiff.

Michael K. Marran, Gerard DeCelles (Abedon, Michaelson, Stanzler & Biener), Providence, for defendant.

## OPINION

FAY, Chief Justice.

This is an appeal from a judgment of conviction rendered by a jury in Superior Court finding the defendant guilty of having committed assault with a dangerous weapon in violation of G.L. 1956 (1981 Reenactment) § 11–5–2, as amended by P.L. 1981, ch. 76, § 1. The defendant was found not guilty on charges of kidnaping. A motion for new trial was denied by the trial justice and the defendant now appeals from that ruling as well as the denial of the defendant's motion to suppress evidence as the fruit of an illegal arrest; from the refusal of the court to pass the case or, in the alternative, to call a new jury panel or to hold a hearing on the issue concerning the absence of blacks in the jury panel; from the court's admittance of evidence concerning the drinking of intoxicating liquor by the defendant without first holding a *Handy* hearing [1]; and from the court's allowance of allegedly prejudicial remarks to be made during the prosecutor's closing argument. The relevant facts of the case are as follows.

In the early morning hours of August 18, 1984, at approximately 1 a.m., Michael Newton, after having completed the second shift at Hasbro Industries and having had a quick "breakfast" at Bill's Restaurant with friends from work, began his usual walk home. This particular trip, however, would be anything but usual. Newton began walking his customary route home until he came upon a possible shortcut off Sabin Street. He decided to take that shortcut and began walking down Sabin Street. He stopped, however, when he heard voices and decided to backtrack and stay on the main streets. He took these precautionary measures because he had cashed his work check earlier that night and wanted to avoid any possibility of getting robbed. As he got closer to the street

he lived on, he noticed a black man on the other side of the street, walking in the same direction as Newton. He then cut through a parking lot to get to Branch Street, the street on which he lived. He turned to check behind him when he saw the black man running in his direction. Newton switched to the left-hand side of the street to let him pass; however, the man did not pass. He ran directly up to Newton and placed a knife at his neck. The black man, later identified as Vincent Gaines, defendant here, forced Newton to travel with him. Gaines placed a bandanna over Newton's eyes and continued to lead Newton away from the direction of his Branch-Street home. Gaines placed Newton in a headlock, forcing Newton's body to be bent over in an awkward position while walking. Newton offered him his wallet in an effort to gain his release; however, defendant did not want it. They were still walking in this awkward position when Pawtucket Police Officer Richard E. Rousseau pulled up in his cruiser in response to a dispatch by the Pawtucket-police-department dispatcher.

Rousseau, at trial, testified that when he arrived at the scene he observed a black male leading a white male in a strong headlock down East Street. He described the bent-over position and stated that they kept walking even though he had asked them what was going on. The black male replied that nothing was going on: "[W]e're just friends." As Rousseau walked up to them, having alighted from his vehicle, the black male released the white male. At about this same time Officer Leo Allard, also having been dispatched to the scene, pulled up in his cruiser. Rousseau took Newton to one side and told Allard to take the black male to the rear of Allard's police car. Rousseau stated, at trial, that Newton appeared nervous and was frightened of Gaines. Gaines repeatedly tried to hear what was happening in the short conversation between Rousseau and Newton. As Gaines would move closer toward them, Newton would jump behind Rousseau, using Rousseau as a buffer between them.

---

1. *Handy v. Geary*, 105 R.I. 419, 252 A.2d 435 (1969); *see infra*, p. 309.

Officer Allard had difficulty keeping Gaines away from Rousseau and Newton for those few minutes.

Newton told Rousseau that he did not know Gaines. He said he was afraid of Gaines and did not want to go with him.

Rousseau then told Allard that this was a. kidnaping and abduction and Gaines was handcuffed and read his rights. Officer Allard then frisked Gaines and found a buckknife in the right-hand pocket of defendant's pants. Upon finding the knife, the officers once again read Gaines his rights.

On cross-examination Rousseau stated that he did not see a blindfold across Newton's eyes when he pulled up, although he did lose sight of the pair momentarily when they walked behind a parked van.

Officer Allard's testimony paralleled that of Rousseau and Newton. Allard also identified the knife at trial, and it was admitted as a full exhibit.

At the police station Newton, while giving his complaint-and-witness statement to the police, stated that he had discarded the bandanna in the street after the police allowed him to go home immediately after the incident. Allard then took Newton up to the area, and the bandanna was retrieved, eventually to be admitted as a full exhibit at trial by the state.

The defendant took the stand in his own defense and testified, in essence, that he and Newton were merely walking together to buy "reefer" (marijuana) when Officer Rousseau arrested him. On cross-examination, Gaines denied that anything had happened the way Newton and Rousseau had described. The defendant was also questioned about the circumstances of his being in Pawtucket at 2 a.m. The defendant stated that he took a bus to the area in an effort to find "reefer," arriving in Pawtucket at approximately 8 p.m. The questioning continued as follows:

"Q What did you do at 8 o'clock?

"A Went to a club.

MR. DeCELLES: Your Honor, I object. May we approach the bench.

THE COURT: Yes.

(BENCH CONFERENCE)

"Q Where did you go at 8 o'clock?

"A ˙ To a bar.

"Q How long did you stay there?

"A Five or six hours.

"Q About five hours. What did you do?

"A Drink.

MR. DeCELLES: Object.

THE COURT: He's answered. Overruled."

Later, in his closing argument, the prosecutor stated:

"Why did he [Newton] go with him? He had a knife at his throat. It was either that or unknown consequences, which he was not going to find out if he didn't have to. All I can say is thank God Officer Rousseau came. Thank God they were dispatched to that scene. Because he might not be here today."

The defendant's objection to this statement was overruled.

The defendant was ultimately found guilty on the charge of assault with a dangerous weapon. He was found not guilty on the charge of kidnaping. We now turn to defendant's exceptions here on appeal.

With respect to defendant's contention that the trial justice erred in denying defendant's motion to suppress the knife as the fruit of an illegal arrest, it is clear upon our review that Police Officer Rousseau had sufficient probable cause to arrest Gaines and conduct a search incident to that arrest. "[P]robable cause exists when the officer has personal knowledge or has been reliably informed of the facts and circumstances that would lead a reasonable person to believe that the arrestee has committed, is committing, or is about to commit a criminal act. * * * In determining whether probable cause exists, the court views 'the cumulative effect of all the facts and circumstances present at the time of the arrest * * * as through the eyes of a reasonable and cautious police officer on the scene * * *.' " *State v. Baton,* 488 A.2d 696, 700 (R.I. 1985).

In the case at bar, the testimony given by Officer Rousseau at the suppression hearing and again at trial shows that Rousseau was responding to a police dispatch concerning a possible abduction of a white man by a black man. When Rousseau arrived at the scene, he personally observed a black man "leading a white male in a strong headlock." Gaines did not release Newton until Rousseau approached them on foot. At about this same time Officer Allard arrived and was told by Rousseau to take Gaines to the rear of his (Allard's) car while Rousseau questioned Newton about what was going on.

■■■ Rousseau clearly had an adequate, reasonable suspicion to stop and momentarily detain Gaines. *See State v. Halstead,* 414 A.2d 1138 (R.I. 1980)("a brief detention for questioning without probable cause to arrest would be permissible as long as the police had 'a reasonable suspicion, based on objective facts, that the individual is involved in criminal activity' "). *Id.* at 1147 (quoting *Brown v. Texas,* 443 U.S. 47, 51, 99 S.Ct. 2637, 2641, 61 L. Ed.2d 357, 362 (1979)); *see also State v. Belcourt* 425 A.2d 1224 (R.I. 1981)("police may make a brief investigatory stop of a 'suspicious individual in order to determine his identity or to maintain the status quo momentarily while obtaining more information * * * ' "). *Id.* at 1227 (quoting *Adams v. Williams,* 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612, 617 (1972)). As soon as Newton told Rousseau that he was not going with Gaines voluntarily, Rousseau unquestionably had sufficient probable cause to arrest Gaines. Therefore, since the arrest of Gaines was valid, the subsequent search of his person incidental to the arrest was also proper. *See In re John C.,* 425 A.2d 536, 539 (R.I. 1981)(citing *United States v. Robinson,* 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973)). We hold, therefore, that the trial justice did not err in denying defendant's motion to suppress the evidence obtained in that search.

■■■ The defendant also contends that the trial justice erred in not passing the case or, in the alternative, in not bringing in a new jury panel or in not holding a hearing once defendant raised the issue that no blacks were present on the jury panel from which his jury was to be drawn.

The defendant made no showing, nor made any claim that the panel had been improperly drawn. The defendant merely contends that it would be "unfair" and would deny Gaines's right to a jury of his peers to proceed without at least the possibility of having one black juror on the jury. The state concedes that the remaining jury panel contained no blacks; these were apparently the last few jurors remaining in the jury lounge. In fact, this particular panel was delayed until jurors were released from other panels in other trials so that this one would be complete and jury selection in this case could proceed. There is no allegation that the prosecutor took any action in his use of peremptory challenges in order systematically to exclude potential jurors solely on account of race. *See Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Thus, on appeal we are faced only with a situation in which no black persons were in this particular jury panel from which this defendant's jury was chosen. As we said in *State v. Clark,* 112 R.I. 270, 275, 308 A.2d 792, 795 (1973), "an accused has no right to demand that members of his race be on the jury which tries him. He does, however, have a right to require that a state not engage in practices which result in the systematic and deliberate exclusion of his race from the jury lists." However, where as here defendant makes neither an allegation nor a showing that the jury-selection process under G.L. 1956 (1969 Reenactment) chapter 9 of title 9, has resulted in the systematic and deliberate exclusion of members of a particular race, *see Clark,* 112 R.I. at 275, 308 A.2d at 795; *see also State v. Johnson,* 116 R.I. 449, 457, 358 A.2d 370, 375 (1976) ("[A] defendant who complains about an absence from the jury of representatives from an identifiable segment of the community must prove that their absence is due to a preconceived plan conceived by those who are responsible for the formulation of the jury lists"), defendant has clearly not met his burden of proof;

thus, the denial of his motions was not error. The Court's holding in *Batson* does not mandate a change in that analysis with respect to a "challenge" either to the jury-panel-selection process or to the composition of a particular jury panel.

The defendant next claims reversible error based upon the trial court's alleged error in allowing testimony concerning defendant's consumption of intoxicating beverages prior to the assault without first holding a *Handy* hearing on the question of intoxication.

We said in *Handy v. Geary*, 105 R.I. 419, 431, 252 A.2d 435, 441–42 (1969), with respect to the use of intoxicants by a witness, that

> "Whenever the issue of intoxication is raised, before evidence of drinking of intoxicants may be presented to the jury, the trial justice shall conduct a preliminary evidentiary hearing on this issue in the absence of the jury. If he finds that the evidence is such that different minds can naturally and fairly come to different conclusions on the question of intoxication, as we have defined that term, then and only then, may evidence of drinking be admitted under proper instructions for ultimate determination of such question by the jury under the same test."

That procedure is equally applicable in criminal cases. *State v. Amaral*, 109 R.I. 379, 386, 285 A.2d 783, 787 (1972); *see also State v. Ahmadjian*, 438 A.2d 1070, 1087–88 (R.I. 1981); *State v. Mattatall*, 114 R.I. 568, 572–73, 337 A.2d 229, 232–33 (1975).

■ It is clear that defendant did not first open the door on the issue of the consumption of intoxicating beverages, *see State v. Rondeau*, 480 A.2d 398, 401 (R.I. 1984); *State v. Gioielli*, 415 A.2d 166, 167–68 (R.I. 1980); nor was intoxication an issue in the case as it was in *State v. Northup*, 486 A.2d 589, 594–95 (R.I. 1985)(driving under the influence). Thus it was clearly error to have admitted this testimony without having held the *Handy* hearing once defendant objected. We must then ascertain whether defendant was prejudiced by the inclusion of this improper evidence such that reversal is necessary.

■ "In analyzing whether reversible error has been committed, we focus upon similar considerations with respect to either the exclusion or inclusion of objectionable evidence. * * * As for the inclusion of objectionable evidence, such error is harmless if 'it is not reasonably possible that such evidence would influence an average jury on the ultimate issue of guilt or innocence.'" *State v. Bowden*, 439 A.2d 263, 269 (R.I. 1982)(quoting *State v. Benoit*, 417 A.2d 895, 901 (R.I. 1980)).

In the case at bar, the prosecutor was attempting to establish the chain of events that ultimately resulted in defendant's presence in Pawtucket at 1 a.m. No theory or contention by either prosecution or defense revolved around the issue of intoxication or the use of intoxicants. Although evidence of the drinking of intoxicating beverages may be potentially prejudicial to a defendant, such is not the case here. The issue of guilt or innocence that the jury ultimately had to decide in this case was whether defendant assaulted Mr. Newton with a dangerous weapon. We hold that under the circumstances of this case, in light of the evidence and testimony presented by both prosecution and defendant, it is not reasonably possible that this minimal evidence of the drinking of intoxicating beverages would have influenced an average jury on the ultimate issue of guilt or innocence, nor would it have so influenced this jury. *See also State v. Santos*, 122 R.I. 799, 822, 413 A.2d 58, 71 (1980)("[i]f the admission of the evidence 'neither distracted the jury's attention from, nor influenced its decision on the ultimate issue of the defendant's guilt,' the error in admitting it was harmless").

The defendant's final two contentions deserve but brief consideration.

■ The prosecutor's remarks in closing argument previously detailed herein were perfectly appropriate as legitimate inferences to be drawn from the evidence presented in this case. *See State v. Conway*, 463 A.2d 1319, 1323–24 (R.I. 1983); *State v. Plante*, 111 R.I. 386, 391, 302 A.2d 804, 807 (1973). Included among the abundance of evidence presented by the state on

direct examination was the testimony of Newton, who stated that while he was being forcibly led down the street, he offered Gaines his wallet but that Gaines told him to put it back. This testimony clearly gave rise to the legitimate inference that something other than robbery was the motive for Gaines's capture of Newton. The trial justice later instructed the jury, as is customary, that counsel's closing arguments to the jury are not evidence, nor are they binding on the jury. That is the province of the jury. We find the prosecutor's remarks proper and nonprejudicial to defendant. The trial justice was correct in overruling defendant's objection.

The defendant's final contention is that the trial justice overlooked or misconceived the testimony of Officer Rousseau in denying defendant's motion for new trial.

 "When considering a motion for a new trial, the trial justice must independently judge and consider the material evidence and also assess the credibility of the witness[es]. If the court determines that there is credible evidence sufficient to support a verdict of guilty beyond a reasonable doubt, the motion for a new trial must be denied." *State v. McMaugh*, 512 A.2d 824, 830 (R.I. 1986); *see also State v. Caprio*, 477 A.2d 67, 73 (R.I. 1984). This court will not disturb that ruling unless the trial justice misconceived or overlooked material evidence or was otherwise clearly wrong. *See State v. Ouimette*, 115 R.I. 476, 348 A.2d 366 (1975).

 The trial justice heard defense counsel's arguments concerning omissions in Rousseau's pretrial testimony as compared with his trial testimony. He also heard the prosecutor explain that the differences in the testimony were not substantial, that there was simply more detail testified to at trial. The trial justice then correctly stated on the record the motion-for-new-trial standard and detailed the procedure he used, including what testimony and witnesses he found to be credible. We find no error in this procedure, nor do we believe that the trial justice misconceived or overlooked any material evidence or was otherwise clearly wrong. The trial justice was correct in

denying the defendant's motion for new trial.

Accordingly, the defendant's appeal is denied and dismissed, the judgment of conviction appealed from is affirmed, and the case is remanded to the Superior Court.